**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HUMAN RIGHTS DEFENSE CENTER,

               Plaintiff,

     v.

ROB JEFFREYS, *et al.*,

               Defendants.

Case No. 18 C 1136

Magistrate Judge Sunil R. Harjani

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Human Rights Defense Center ("HRDC") filed this lawsuit against various employees of the Illinois Department of Corrections ("IDOC"), alleging Defendants have adopted and implemented mail policies and procedures which violate the First and Fourteenth Amendments of the United States Constitution. The claims arise out of Defendants' alleged improper censorship of HRDC's monthly journal, *Prison Legal News*, and other publications that it sends to prisoners in the IDOC.

The parties are engaged in fact discovery. HRDC has moved to compel four categories of information from Defendants: (1) documents dated prior to 2016; (2) information related to IDOC facilities not named in the First Amended Complaint ("Amended Complaint"); (3) information related to censorship occurring outside the publication review process; and (4) lists of persons who worked in IDOC mailrooms during the relevant period.[1] HRDC also moves to compel Defendants to permit HRDC to inspect mailrooms in fourteen IDOC facilities. Defendants argue that they have already produced thousands of pages of documents and HRDC's other requests seek discovery on topics not relevant to the allegations of the Amended Complaint and would

---

[1] During the briefing on the motion to compel, Defendants agreed to provide documents responsive to HRDC's request regarding IDOC libraries for the time period of January 1, 2016 to the present.

significantly increase the burden on Defendants, as would the proposed inspections of IDOC mailroom facilities. For the reasons discussed below, HRDC's motion to compel [194] is granted in part and denied in part.

## I. <u>BACKGROUND</u>

HRDC is a 501(c)(3) non-profit charitable organization located in Lake Worth, Florida. Doc. 150, Am. Compl. ¶ 6. Its mission is "public education, advocacy, and outreach on behalf of, and for the purpose of assisting, prisoners who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights." *Id*. at ¶ 35. To that end, HRDC publishes and distributes periodicals and books with the goal of educating prisoners on issues of public concern, such as the operation of prison facilities, prison conditions, prisoners' health and safety, and prisoners' rights. *Id*. at ¶ 36. HRDC publishes two monthly newsprint journals, *Prison Legal News* and *Criminal Legal News*, which contain news and analysis regarding various topics, including prisoner's rights, court rulings, management of prison facilities, prison conditions, and the criminal justice system and reform outside the prison system. *Id*. at ¶¶ 6, 32, 33. According to HRDC, it has thousands of subscribers in the United States and abroad, including prisoners, attorneys, journalists, public libraries, judges, and members of the public. *Id*. at ¶ 37. It alleges that its *Prison Legal News* and *Criminal Legal News* are very popular among prisoners in Illinois. *Id*. at ¶ 38.

This action arises out of HRDC's allegation that certain prisons within the state of Illinois have withheld all or part of issues of *Prison Legal News* and *Criminal Legal News*, as well as books published and/or distributed by HRDC. Doc. 150, ¶ 42. HRDC further alleges that Defendants have adopted and implemented mail policies and practices at IDOC facilities which violate the First and Fourteenth Amendments by depriving HRDC of its right to distribute its

materials to prisoners, and or notice or opportunity to appeal when its publications are not delivered to prisoner subscribers. *Id*. at ¶¶ 2, 41. As relief, HRDC seeks injunctive and declaratory relief and damages.

## II. DISCUSSION

Federal Rule of Civil Procedure 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Courts assess proportionality by "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*. As the moving party, HRDC bears the initial burden of demonstrating that the documents it seeks are relevant. *Kove IO, Inc. v. Amazon Web Services, Inc.*, 2021 WL 4516413, at *2 (N.D. Ill. July 14, 2021). "If the information appears relevant, the party resisting production has the burden of showing why the request is improper." *Id*. In considering these issues, magistrate judges "enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013).

As described above, HRDC seeks four categories of information from Defendants as well as permission to inspect mailrooms in fourteen IDOC facilities. The Court addresses each issue in turn.

A.        **Facilities Not Named in the Complaint**

HRDC first contends that Defendants should be compelled to produce information related to facilities not named in the Amended Complaint.[2]  Defendants produced documents related to the fourteen facilities mentioned in the Amended Complaint, leaving twelve contested facilities subject to HRDC's motion to compel.  Defendants oppose HRDC's request for censorship-related documents at an additional twelve IDOC facilities, asserting that the request is not relevant to the specific censorship claims alleged in the Amended Complaint and would constitute an undue burden on Defendants.

Defendants' relevance and undue burden objections are overruled.   The thrust of Defendants' relevance objection is that HRDC's request for censorship and notice of censorship discovery from the additional twelve IDOC facilities is speculative and amounts to an improper "fishing expedition."  According to Defendants, this is because the Amended Complaint does not allege a basis to believe that HRDC's publications are being unconstitutionally censored at any other facility beyond the fourteen facilities mentioned in the complaint.  Defendants also contend that documents relating to the twelve facilities not alleged in the Amended Complaint do not tend to prove or disprove whether materials were censored at the other fourteen, nor whether those fourteen facilities provided notice of censorship to HRDC.

The Court does not read the Amended Complaint so narrowly.  The allegations in the Amended Complaint are sufficient to support discovery into alleged censorship and notice of censorship at IDOC facilities other than the facilities mentioned in the Amended Complaint.  And the use of the term "fishing expedition" by the party opposing discovery is old, tired, and no longer

---

[2]        HRDC states that it has limited the number of discovery requests applicable to all IDOC facilities, with sixteen requests seeking information from all IDOC facilities and the rest limited to (1) only IDOC's centralized policies and practices, or (2) those facilities named in the Amended Complaint.

persuasive. "[S]ome amount of fishing is generally necessary in the pretrial discovery process." *Eternity Mart, Inc. v. Nature's Sources, LLC*, 2019 WL 6052366, at *3 (N.D. Ill. Nov. 15, 2019); *see also Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 931 (7th Cir. 2004) ("[O]f course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes."). The real question is whether a court should authorize the so-called "fishing expedition." The answer lies in properly weighing the relevancy and proportionality of the discovery request as required by Rule 26(b)(1).

The Amended Complaint makes clear that HRDC has alleged systemic constitutional violations stemming from "mail and censorship policies adopted or approved by Defendants Baldwin and Jeffreys in their capacities as directors of IDOC." Doc. 150, ¶ 94; *see also id.* at ¶ 2 ("Defendants have adopted and implemented mail policies and practices prohibiting delivery of written speech from HRDC while failing to provide due process notice of and an opportunity to challenge that censorship."); *id.* at ¶ 93 ("In adopting and implementing the above censorship policies and practices, Defendants have knowingly violated, continue to violate, and are reasonably expected to violate in the future, HRDC's constitutional rights."); *id.* at ¶ 96 ("Defendants' unconstitutional policy, practices, and customs are ongoing and continue to violate HRDC's rights."). Moreover, in its recent opinion denying Defendants Baldwin's and Jeffreys' motion for judgment on the pleadings, the district judge determined that HRDC's allegations support a theory that its inability to communicate with prisoners in violation of the First and Fourteenth Amendments "is a 'potentially systemic' problem for which one or both of the Director Defendants could be found individually liable." Doc. 197 at 5; *see also id.* at 6 (Amended Complaint's "allegations plausibly suggest the existence of systemic constitutional violations likely to affect a widespread group of inmates.") (internal quotes omitted). Further, the Amended Complaint

explicitly alleges that the specific instances HRDC describes in the Amended Complaint are only "examples" of unconstitutional censorship and/or inadequate notice, not an exhaustive list. Doc. 150, ¶ 43; *see also* Doc. 197 at 5 (HRDC's Amended Complaint "provides sixty-five specific examples of improper censorship and/or lack of notice by prisons within IDOC."). As a result of these allegations, the Court has no trouble concluding that HRDC's discovery requests for all 26 IDOC facilities is relevant to support its claims of system-wide policies and practices that have allegedly resulted in systemic unconstitutional censorship and inadequate notice of that censorship. Alternatively, even if HRDC's publications were made available to inmates in the unnamed facilities without any unconstitutional censorship, information pertaining to unnamed facilities may be relevant to whether the named facilities censorship policies and practices were deficient compared to other IDOC facilities. *Johnson v. Raemisch*, 557 F.Supp.2d 964, 975 (W.D. Wis. 2008) (holding defendants' security or rehabilitation rationale for censorship was undermined where "multiple Wisconsin prisoners received the newsletter without apparent consequence.").

Citing federal pleading rules, Defendants argue they have not received "fair notice" that its claims extended beyond those facilities. The Court disagrees. Under the federal notice-pleading standard, a complaint need only "give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S 662, 678-79 (2009) (Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). HRDC's allegations—which the Court detailed above—are sufficient to give Defendants fair notice of the systemic nature of HRDC's claims and the grounds upon which they rest. Moreover, the fact that the specific examples identified in the Amended Complaint span fourteen facilities, representing over 50% of IDOC

facilities, supports a reasonable inference that the censorship of HRDC's publications and insufficient notice to appeal is systemic and not limited to a select few facilities.

Going further, Defendants point out that despite HRDC's extensive preliminary investigation before filing the Amended Complaint which resulted in specific allegations regarding fourteen IDOC facilities, the same investigation apparently turned up nothing regarding the twelve other facilities. However, it might certainly be the case that HRDC's lack of information regarding censorship practices at the unnamed facilities could be the direct result of the very inadequate notice procedures that it challenges in this litigation. Because Defendants allegedly failed to provide notice of censorship, HRDC potentially has no means of determining and alleging the full extent of censorship at issue in IDOC's system without the requested discovery.

Next, Defendants note that HRDC did not allege in either the Amended Complaint or its motion to compel that it has any subscribers at the other twelve facilities or has otherwise attempted to communicate with individuals at the other twelve facilities. However, HRDC has addressed this issue in the declaration attached to its reply brief, which states that HRDC has records of at least one subscriber in each of the eleven unnamed facilities at times relevant to the allegations in the Amended Complaint. Doc. 200-2, ¶ 5. Given all this, HRDC's request for discovery relating to censorship and inadequate notice in the unnamed facilities is not suggestive of an impermissible fishing expedition for new claims. The Court finds that information and documents relating to potential censorship and inadequate notice in the unnamed facilities is relevant to Defendants' allegation of system-wide censorship and notice practices in all of IDOC facilities to deprive prisoners of access to HRDC's publications.

Finally, Defendants argue that producing evidence from every IDOC facility is unduly burdensome and not proportional to the needs of this case. Defendants' burden objection is largely

unsubstantiated. Other than generally stating that they "have already produced thousands of pages of documents related to th[e] fourteen facilities" and "[b]roadening the scope of discovery to include the other twelve facilities would more [than] double Defendants' workload," Defendants do not offer any specifics or even an estimate of the burden involved in producing discovery related to the unnamed facilities, nor is there an affidavit or declaration explaining the burden. *See* Fed. R. Civ. P. 26(b)(1), Advisory Committee Note to 2015 Amendment (explaining that the 2015 amendment regarding proportionality was not "intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional"); *Heraeus Kulzer, GmbH, v. Biomet, Inc.*, 633 F.3d 591, 598 (7th Cir. 2011) ("A specific showing of burden is commonly required by district judges faced with objections to the scope of discovery."). Thus, Defendants' argument about the burden lacks merit. In addition, other Rule 26 proportionality factors, including the importance of the issues at stake in the action and of the discovery in resolving the issues, and the parties' relative access to information—weigh in favor of allowing discovery relating to more than just the fourteen facilities mentioned in the Amended Complaint.

Accordingly, the Court grants HRDC's motion to compel production of information and documents with respect to IDOC facilities other than the facilities named in the Amended Complaint.

## B. Documents from 2015

HRDC next moves to compel documents dating back to January 1, 2015. Defendants object to producing documents prior to 2016 on the ground that such documents fall outside Section 1983's statute of limitations period. This action was filed on February 13, 2018. Because the statute of limitations for Section 1983 claims in Illinois is two years, *Manuel v. City of Joliet*, 903 F.3d 667, 668 (7th Cir. 2018), Defendants argue that the relevant period starts at February 13,

2016 and the scope of discovery should be limited to censorship decisions that occurred from February 13, 2016 onward.[3] HRDC responds that its pre-February 13, 2016 allegations of censorship are timely under the "continuing wrong" or "continuing violation" rule. *See Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013) (*quoting Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)) ("A violation is continuing where 'it would be unreasonable to require or even permit [a prisoner] to sue separately over every incident of the defendant's unlawful conduct.'"). HRDC alleges that Defendants' unconstitutional policies and practices are a continuing violation still in effect to this day. In other words, it proposes that under these circumstances the statute of limitations has not begun to run on its constitutional claims. *See Manuel*, 903 F.3d at 669 ("When a wrong is ongoing rather than discrete, the period of limitations does not commence until the wrong ends."); *Turley* 729 F.3d at 651 (for continuing violations, the statute of limitations starts to run from the date of the last incident of that violation, not the first). Defendants dispute that the continuing wrong rule applies in this case. Doc. 198 at 9-10.

The Court need not decide the question of whether pre-February 13, 2016 acts are time-barred or part of a continuing violation to rule on this discovery motion. Even if Defendants are correct that conduct occurring prior to February 13, 2016 is time-barred, HRDC is still entitled to the discovery it seeks. Evidence outside a limitations period is not automatically irrelevant to the claims and defenses in a case. "The statute of limitations is not a rigid barrier separating discoverable information from information outside the scope of discovery." *Gottesman v. Santana*, 2017 WL 5889765, at *5 (S.D. Cal. Nov. 29, 2017); *In Re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 351, 358 n.5 (N.D. Ill. 2005) ("While in certain instances it might be proper to deny discovery of documents on the ground that they would only be relevant to events occurring before

---

[3] For the sake of convenience, Defendants have agreed to produce documents dating back to January 1, 2016.

an applicable limitations period, where the information is otherwise relevant, the statute of limitations is not a basis for barring discovery."); *U.S. ex rel. Roberts v. QHG of Indiana, Inc.*, 1998 WL 1756728 at *9 (N.D. Ind. Oct. 8, 1998) ("Rule 26(b)(1) "is phrased in terms of 'relevance,' rather than time."). Moreover, Defendants have provided no case law to suggest that the statute of limitations renders earlier alleged censorship or lack of notice of censorship entirely irrelevant. Therefore, it is inappropriate to use the statute of limitations as an automatic bar to discovery.

It is well established that conduct outside the limitation period may still be relevant "as background evidence in support of a timely claim." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (interpreting Title VII and holding that the statute of limitations does not bar a plaintiff "from using the prior acts as background evidence in support of a timely claim"); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (an untimely discriminatory act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue"); *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009) (permitting plaintiff to use time-barred claims of retaliation and discrimination as "background evidence" for timely claims).[4] "Indeed, as a leading commentator has stated, '[t]he fact that matters with respect to which discovery is sought may be time-barred by the applicable statute of limitations does not foreclose discovery,' particularly because an act 'beyond the period of limitations may constitute relevant background evidence in a proceeding in which a current practice is at issue.'" *U.S. ex rel. Roberts*, 1998 WL 1756728 at *9 (federal False Claims Act case) (citing 6 Moore's Federal

---

[4]    *See also Mitchell v. City of Chicago*, 2010 WL 1930107, at *6 (N.D. Ill. May 10, 2010) (Dow, J.) (declining to strike specific allegations within plaintiff's complaint because *Morgan* "teaches that non-actionable incidents may serve as background evidence."); *Anderson v. Chicago Transit Authority*, 2010 WL 331722, at *6 (N.D. Ill. Jan. 22, 2010) (Dow, J.) (under *Morgan*, plaintiff "is not barred from using untimely acts as background evidence in support of other timely claims.").

Practice § 26.41[7] (3d ed.1998)). Defendants have offered no reason why the *Morgan* rule would not apply to claims under Section 1983, and the Court cannot discern any reason.

Here, certain censorship allegations in the Amended Complaint date back to 2015. Specifically, HRDC alleges that the November 2015 issue of *Prison Legal News* was censored by the staff at Menard. Doc. 150, ¶¶ 63-65. HRDC also alleges that the violations of its constitutional rights and its injuries were caused by Defendants' uniform policies and practices. *Id.* at ¶¶ 103, 111. Conduct that occurred before February 13, 2016 is relevant because it bears on the issue of whether Defendants' conduct after February 13, 2016 arose from a common set of inmate mail policies and practices. For this reason, the alleged censorship acts that occurred before 2016 may serve as relevant background evidence regarding censorship acts that occurred after 2016 and as such, are discoverable.

Regarding relevance, Defendants assert that at the time relevant to the facts alleged in the Amended Complaint, it was explicit IDOC policy to provide notice of censorship decisions to publishers. Doc. 198 at 10. Defendants are wrong, however, in asserting that evidence from before February 13, 2016 is rendered irrelevant by IDOC's explicit notice policy. There is a difference between unwritten policies and practices and a formal, written policy. In other words, evidence that HRDC did not receive notice pursuant to unwritten IDOC policies or practices that operate contrary to the explicit written policy of IDOC would be relevant to IDOC's inadequate notice claim.

Defendants also assert that production of documents dating back to January 1, 2015 would be unduly burdensome, but their burden argument is dependent on a finding that the documents from before 2016 are irrelevant. *See* Doc. 198 at 8 ("[D]ocuments dating before January 1, 2016 are irrelevant. They will not tend to show whether particular censorship decisions from February

13, 2016 onward occurred, whether those decisions were warranted, or whether Plaintiff received notice of them. The request is therefore unduly burdensome."). Accordingly, the Court does not address any burden related to the production of documents dating back to January 1, 2015 separate and apart from finding that the documents are relevant to HRDC's claims of unconstitutional censorship and notice of censorship policies and practices. Further, even if Defendants had separately raised and substantiated any burden objection unrelated to the relevance of the documents, HRDC has substantially limited its request for responsive documents to only one additional year, which is a reasonable limitation on the pre-2016 document production. Finally, and contrary to Defendants' argument, an additional year's worth of documents would not be unnecessarily cumulative of records Defendants have produced from January 1, 2016 onward because they could provide additional evidence of Defendants' policies and practices.

For these reasons, Defendants have failed to show that its documents dating back to 2015 are *per se* irrelevant to HRDC's claims or otherwise not discoverable. Accordingly, HRDC's motion to compel documents from 2015 is granted.

## C. Censorship Outside the Formal Publication Review Process

HRDC next seeks to compel Defendants to produce information related to publications that were censored, or otherwise confiscated, outside the formal publication review process. In their response, Defendants object to producing discovery about censorship outside the formal publication review process on three grounds. First, Defendants submit that HRDC's request is improper because it seeks discovery on a claim it has not alleged in the Amended Complaint. Second, Defendants assert that they should not be compelled to produce discovery on censorship outside the formal publication review process because publishers like HRDC lack standing to bring

such a claim.  Third, Defendants object to production regarding censorship outside the formal publication review on the ground that such production would be unduly burdensome.

Defendants' first objection as to relevancy is well-taken.  With one single exception, HRDC has not shown that discovery related to censorship outside the formal publication review process is relevant to any claim or defense in this case.  As an initial matter, while not entirely clear, HRDC appears to be seeking documents relating to two forms of censorship outside the formal publication review process: (1) censorship after the formal review process but before its publication reached HRDC subscribers and (2) censorship after its publication had been delivered to subscribers.[5]  For the reasons stated below, the motion to compel is denied as to both forms of censorship outside the formal publication review process.

HRDC argues that its claims are not limited to censorship occurring during the publication review process and asserts that its Amended Complaint "specifically includes allegations of censorship outside the formal review process." Doc. 194 at 2.  As to the first category of censorship outside the publication review process discovery sought, HRDC cites to paragraphs 45 and 69 of its Amended Complaint to support its argument that it has alleged "multiple instances in which IDOC censored publications *after* the formal review process, but *before* the publication reached HRDC subscribers." Doc. 194 at 11-12.  However, the facts alleged in paragraphs 45 and 69 of the Amended Complaint do not provide support for granting HRDC's broad request for discovery

---

[5]  Defendants' response states that by "'censorship outside the publication review process,' Defendants understand Plaintiff to be seeking information about instances in which an IDOC employee may have confiscated a publication as contraband *after it was delivered to a subscriber—e.g.,* a guard confiscating a publication during a shakedown." Doc. 198 at 11 (emphasis added).  In its reply brief, HRDC does not object to Defendants' understanding of its request, but HRDC then argues that its Amended Complaint alleges "instances in which Defendants' censorship occurred *after the formal review process but before the publication reached subscribers*." Doc. 200 at 7 (emphasis added).  Because it is not clear whether HRDC seeks to compel documents related to: (1) censorship after the formal review process but before the publication reached HRDC prisoner subscribers and/or (2) censorship after a publication was delivered to subscribers, the Court addresses both categories of documents.

related to censorship outside the formal publication review process at all IDOC facilities. With the exception of the footnote to paragraph 69 discussed below, those paragraphs contain no allegations about censorship that occurred after the formal review process but before the publication reached HRDC subscribers. Paragraph 45 alleges that issues of *Prison Legal News* were mailed to subscribers at Big Muddy and those issues "were withheld from delivery by staff at the facility." Doc. 150, ¶ 45. Similarly, Paragraph 69 states that subscribers at Pinckneyville did not receive various issues of *Prison Legal News* because they "were withheld from delivery by staff at the facility." *Id*. at ¶ 69. These paragraphs allege only that prisoners at Big Muddy and Pinckneyville were mailed HRDC publications that they did not receive, but the Amended Complaint does not say why or when. There is no contention related to censorship after the formal review process but before the publication was delivered to HRDC subscribers. Because nothing in paragraphs 45 and 69 suggests that the publications were not censored through the publication review process, providing discovery regarding IDOC censored publications after the formal publication review process but before the publication reached HRDC subscribers on the basis of paragraphs 45 and 69 is not warranted.

A footnote to paragraph 69 of the Amended Complaint does allege a single instance of censorship outside the formal publication review process: "In June of 2017, *one subscriber* received a Cumulative Counseling Summary detailing numerous grievances against the prison. In this document, Chalene Hale, an administrator at Pinckneyville, indicated that *Prison Legal News* was withheld by the prison *after* a publication review." Doc. 150, ¶ 69 n. 2 (emphasis added). In its motion, HRDC cites to paragraph 69 and says "[i]n at least one instance, a review of medical records showed HRDC publications were withheld from prisoners by mental health officers, not publication officers." Doc. 194 at 12. With this explanation in mind and as best the Court can tell,

the Amended Complaint appears to assert that one subscriber at Pinckneyville was denied *Prison Legal News* by a mental health officer after the publication review process.  But there are no allegations in the Amended Complaint which flesh out or even mention mental health officers' censorship at IDOC facilities after publication review or that otherwise indicate that discovery into other instances of censorship by mental health officers at other IDOC facilities is relevant and proportional to the needs of this case.  Notably, HRDC does not cite to any allegations in the Amended Complaint that pertain to a policy or widespread practice of HRDC publications being approved during the publication review process but subsequently being censored by mental health officers, and its lone allegation in the footnote to paragraph 69 is insufficient to support discovery into all instances of censorship by mental health officers outside the formal review process at all IDOC facilities.[6]  Beyond paragraphs 45 and 69, HRDC has not offered any justification for why information about censorship *after* the formal review process, but *before* the publication reached HRDC subscribers is relevant to its claims.  Accordingly, as it relates to the first category of censorship outside the publication review process discovery, HRDC's motion to compel is granted only as to the instance described in the footnote to paragraph 69 of the Amended Complaint and denied as to the remainder of its request.

To the extent HRDC also seeks documents relating to censorship after publications are delivered to prisoners, its request appears unsupported by allegations in the Amended Complaint. HRDC argues that denying production as to that category of censorship discovery "would enable

---

[6]     The Court notes that the Amended Complaint does not indicate whether the one instance described in the footnote to paragraph 69 of the *Prison Legal News* being withheld after publication review occurred before or after the publication was delivered to the subscriber.  However, HRDC cites paragraph 69 as an example of IDOC censoring publications after the formal publication review process but before the publication reached HRDC subscribers. Doc. 194 at 11-12.  Thus, the Court assumes the incident alleged in the footnote to paragraph 69 occurred after the formal publication review process but before the publication reached the subscriber.

Defendants to easily evade judicial scrutiny for unconstitutional censorship by simply waiting until after prisoners were in physical possession of HRDC's publications before confiscating them." Doc. 200 at 9. However, HRDC has not met its burden of establishing that discovery related to censorship after delivery is relevant to the actual policy and practice claims involved in this action and proportional to the needs of the case. The claims asserted in the Amended Complaint appear to relate to censorship before publications are delivered to prisoner subscribers. For example, the Amended Complaint alleges that "Defendants have adopted and implemented mail policies and practices prohibiting *delivery* of written speech from HRDC while failing to provide due process notice of and an opportunity to challenge that censorship." Doc. 150, ¶ 2 (emphasis added). HRDC further alleges that "Defendants policies and practices have deprived and will continue to deprive HRDC of the right to distribute its materials to prisoners, and of notice or opportunity to appeal when its publications are not *delivered* to prisoner subscribers." *Id*. at ¶ 41 (emphasis added); *see also id*. at ¶ 97 (the injunctive relief sought is an order prohibiting "Defendants from refusing to *deliver* or refusing to allow *delivery* of publications, books, informational brochures, and catalogs, and other correspondence from HRDC, and prohibiting Defendants from censoring mail without due process of law."). Moreover, HRDC does not cite to any allegation contained in its Amended Complaint suggesting that Defendants have a policy or engage in a pattern or practice of wrongly censoring HRDC publications after delivery to prisoner subscribers. In light of this record, the discovery HRDC is seeking about censorship after its publications have been delivered to subscribers is not relevant to the alleged claims or proportional to the needs of this case within the meaning of Rule 26(b)(1). As such, HRDC's request to compel the production documents relating to censorship after delivery to prisoners subscribers is denied.

D.     **Mailroom Staff**

HRDC asked Defendants to produce documents showing all mailroom staff or persons otherwise involved in censoring publications within IDOC from 2015 to the present.  HRDC argues that its request for the identity of mailroom staff or other persons involved in censoring publications seeks relevant information as each staff member engaged in the publication review process is a potential witness to the alleged constitutional violations.  Defendants assert that the request imposes an undue burden on them.  Specifically, Defendants claim that "the only way to identify the mailroom staff is to look at each facility's daily roster/assignment sheet, which is only kept in hardcopy, and not maintained in electronic form." Doc. 198 at 16.  IDOC's declaration states that "the daily rosters from each day of each year for every facility would need to be pulled from storage and copied/scanned[.]" *Id.*  Thus, since there does not exist a list of all mailroom employees across facilities, the production of all hard-copy documents at issue (365 roster/assignment sheets each year for 26 facilities for a 7-year period) does pose an undue discovery burden to the IDOC.

Additionally, HRDC is correct that the entire mailroom staff at each of the 26 facilities for a 7-year period are potential witnesses to the alleged censorship.  But that certainly does not mean that each of those mailroom staff employees will be deposed in this action or will be a trial witness.  For example, mailroom staff supervisors, who presumably have some broader knowledge on the censorship operations, will likely have more useful information than lower-level mailroom staff.  In addition, at the motion hearing in this matter, HRDC acknowledge that it would like to depose some front-line mailroom staff (likely 5-10 individuals), selected at random among the IDOC institutions to get a sense of the front-line operations.  Accordingly, the relevance of all roster

sheets identifying by day every single individual who has worked at each of the 26 IDOC mailrooms over the course of seven years is minimal.

A more relevant and proportional production is as follows: (1) document(s) identifying the mailroom supervisor at each of the 14 IDOC mailrooms over the 7-year period; (2) roster sheets for a six-month period during the year 2017 at the 14 IDOC mailrooms; and (3) roster sheets for July 2022 at each of the 14 IDOC mailrooms. The first category – mailroom supervisors – will provide HRDC with information about the general policy and practices of the mailroom staff at each facility. The second category will allow HRDC to have a sufficient sample to randomly select several front-line mailroom staff for depositions. The Court is permitting a six-month period during the year 2017 as the Amended Complaint has numerous allegations across various IDOC facilities about alleged improper censorship during that year. ¶ 44-92. HRDC is given leave to identify the six-month period during 2017 for which it wishes to obtain roster sheets. A six-month period will allow HRDC to determine that a mailroom employee will have worked sufficiently long enough to be familiar with the mailroom process. And, of course, IDOC mailroom employees may have worked at the facility for much longer than that six-month period in 2017, which can also provide HRDC with information from additional years. Third, the Court has permitted one month of roster sheets from July 2022 to provide HRDC with a representative sample of mailroom employees knowledgeable about current IDOC practices, as HRDC also seeks injunctive relief in this action. The Court has also limited the discovery to the 14 institutions named in the Complaint, as at this time, HRDC has the best evidence of alleged censorship at these facilities and thus it seems likely that depositions of employees from one or more of these facilities would bear more fruit. It is also important to note that there are other mechanisms for HRDC to determine appropriate front-line mailroom witnesses, such through the depositions of the mailroom

supervisors. Thus, these limitations are made in light of the other discovery processes available to HRDC to obtain this information.

For the above reasons, HRDC's request for documents identifying IDOC personnel involved in censoring publications within IDOC is granted only in part.

### E. Inspections

Finally, HRDC seeks to inspect the "mail rooms, and/or all areas where mail is received, sorted, reviewed, withheld, censored, sent out, etc." of the fourteen IDOC facilities named in its Amended Complaint. Doc. 194-2 at 34-40. Defendants oppose the proposed inspections arguing that they are irrelevant, and any minimal relevance is outweighed by the burden imposed and Defendants' security and privacy concerns. Doc. 198 at 17-18. In particular, Defendants contend that consistent with their prior objections, the proposed inspections would require significant expenditure of resources and implicate inmate privacy concerns and security concerns related to allowing outsiders into secure correctional facilities. Doc. 194-2 at 44-48.

Under Federal Rule of Civil Procedure 34, "[a] party may serve on any other party a request within the scope of Rule 26(b) . . . to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it." Fed. R. Civ. P. 34(a)(2). Further, "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed . . . if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive[.]" Fed. R. Civ. P. 26(b)(2)(C)(i).

At this time, Defendants' relevancy objection has merit. The burden of the requested inspections appear to outweigh the likely benefit and would be disproportional to the needs of the

case.  As to the value of the inspections, HRDC asserts that the "opportunity to determine how the personnel interpret the operative censorship guidelines is crucial."  Doc. 200 at 10.  But Defendants assert, and HRDC agrees, that HRDC would not be allowed to question or "depose" mailroom employees during these inspections.  *See* Doc. 198 at 71; Doc. 200 at 11.  Thus, HRDC would essentially be watching mailroom processing on a random day, which may or may not result in any publication being selected for censorship on that day.  Moreover, the decision on whether to censor a particular publication, and provide subsequent notice to the publisher, is not made in the mailroom, as revealed at the motion hearing, but rather is sent to another individual and/or committee for review.  It is thus not apparent how the mere examination of the operations of each mailroom would show how the mailroom personnel are interpreting the censorship guidelines.

HRDC argues that the information it seeks through the inspections of fourteen IDOC mailrooms is relevant for two reasons.  First, HRDC argues that "initial censorship determinations are made by mailroom staff who then forward the publication for review to the facility Publication Review Officer."  Doc. 194 at 13.  Because it alleges a pattern of inconsistent censorship across IDOC facilities, despite the existence of a purportedly uniform policy, HRDC asserts that "[o]bserving the actual practice at each facility is essential to understanding the different, and potentially unconstitutional, practices occurring across IDOC."  *Id*. at 13-14.  The Court disagrees.  Depositions of IDOC personnel, including mailroom staff and supervisors, would be far for more revealing than watching mail processing, which may or may not involve censorship on that randomly selected day.  And while it is true that the initial decision to forward a particular publication for censorship review is made by the mailroom staff, the core allegations by HRDC – the actual decision to censor and provide (or not provide) notice to the publisher – is made outside of the mailroom.  Moreover, the time lag between the initial review at the mailroom and the actual

decision to censor and provide notice is unknown at this time. Thus, the constitutional significance of the first step in this two-step process is also unknown at this time. Again, depositions would provide more information to better determine the relevancy of this inspection request.

Second, HRDC argues that observing each facility's procedures for processing and reviewing publications is relevant to "HRDC's responses to Defendants' burden-based defenses." Doc. 200 at 10. It is true that in determining whether a prison regulation is constitutional, a court must consider, among other factors, what "impact [an] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner v. Safley*, 482 U.S. 78, 90 (1987); *Lindell v. Frank*, 377 F.3d 655, 659 (7th Cir. 2004) (holding that prison officials could accommodate prisoner's First Amendment rights "without a large burden on staff."). However, permitting inspection on the basis of this issue is premature. Depositions have not yet begun, and information about what burden exists, if any, on mailroom staff in the context of implementing censorship policies and practices is presently not known. The Court has limited information on this issue, and frankly, this additional rationale was only raised in HRDC's reply brief and is waived. *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) ("arguments raised for the first time in a reply brief are waived.").

The Court also recognizes that the burden imposed by permitting inspections is significant because the IDOC facilities are several hours from the Chicago area, where counsel for Defendants work. Counsel would be required to travel to fourteen facilities: "Eight of the 14 facilities are located more than 200 miles from downtown Chicago, while three facilities (Menard Correctional Center, Shawnee Correctional Center, and Vienna Correctional Center) are approximately 350 miles from downtown Chicago. Granting this access would require a significant expenditure of

state resources, as it would require counsel for Defendants to spend days, if not weeks, traveling to and from each location." Doc. 194-2 at 45-46.

All in all, at this time, the Court finds that HRDC can obtain the discovery it seeks through more convenient, less burdensome, and less expensive sources, such as depositions. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). The Court's ruling is without prejudice to HRDC raising the issue again at a later time. After depositions, it is likely that all parties involved will have more information to work with, have a better sense about the value of these inspections, as well as a more developed record on the factual contentions associated with the alleged burdens on IDOC mailroom staff. It is also possible that, as a result of deposition testimony, observing operations at one facility, rather than all fourteen facilities, may suffice, which would significantly reduce the discovery burden associated with the present request. Accordingly, HRDC's request for mailroom inspections at fourteen facilities is denied without prejudice.[7]

### III. **CONCLUSION**

For the reasons stated above Plaintiff's Motion to Compel Responses to its Discovery Requests and to Compel Defendants to Permit its Request for Inspection [194] is granted in part and denied in part. Defendants shall produce responsive information and documents within their possession, custody, or control consistent with this opinion by October 4, 2022.

**SO ORDERED.**

Dated: September 22, 2022

_____
Sunil R. Harjani
United States Magistrate Judge

---

[7] Given the Court's ruling, at this time, the Court need not delve into Defendants' security and privacy concerns.

22