## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HUMAN RIGHTS DEFENSE CENTER, | |
| Plaintiff, | Case No. 18-cv-01136 |
| v. | Judge Mary M. Rowland |
| John Baldwin, *et al.* | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Human Rights Defense Center ("HRDC") has sued 22 individual Defendants who are former or current Illinois Department of Corrections ("IDOC") employees under 42 U.S.C. § 1983, alleging that various of IDOC's mail publication review policies facially violate the First and Fourteenth Amendments, and that IDOC committed several violations of the same amendments as applied to HRDC. Before the Court now are the parties' cross-motions for summary judgment. For the reasons stated below, both parties' motions [290][305] are granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are

1

material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*.

Where, as here, the parties have filed cross-motions summary judgment, the standard is unchanged. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). The Court must construe all facts and inferences arising from the parties' motions "in favor of the party against whom the motion under consideration is made." *Id*.

## BACKGROUND[1]

### I.    Plaintiff

---

[1] The facts are taken from the numerous statements of fact that the parties filed in this action and are undisputed unless otherwise noted.

HRDC is a non-profit 501(c)(3) corporation headquartered in Florida. [308] ¶ 1. HRDC's mission is public education, advocacy, and outreach on behalf of, and for the purpose of assisting, prisoners who seek legal redress for infringements of their constitutional and human rights. [308] ¶ 1. HRDC publishes two monthly journals that are relevant in this litigation: Prison Legal News ("PLN") and Criminal Legal News ("CLN"). [308] ¶¶ 2-3. PLN is a monthly newsprint that has been continuously published since 1990, and it provides information about legal issues, access to courts, disciplinary hearings, prison conditions, excessive force, mail censorship, prison and jail litigation, visitation, telephones, religious freedom, sexual violence in prisons, and the death penalty. [308] ¶ 2. CLN is a monthly newsprint that has been published continuously since December 2017 that focuses on a review and analysis of individual rights, court rulings and news about criminal legal issues. [308] ¶ 3. HRDC only communicates with inmates through mailed correspondences like PLN and CLN; it does not broadcast television or radio programs, nor does it send visitors to inmates. [308] ¶ 4.

## II.    IDOC Publication Review Policy

The IDOC's publication review policy and procedures are contained in Administrative Directive ("AD") 04.01.108. [308] ¶ 93. Prior to this lawsuit, AD 04.01.108 was last updated in 2006 (the "2006 AD"). The AD has since been revised at least twice: once in 2019 (the "2019 AD") and once in 2022 (the "2022 AD"). [308] ¶ 94. Under all three ADs, if a publication is censored, an IDOC facility is required to provide notice to the publisher only if the publication "was [mailed or] received

directly from the [p]ublisher." [308] ¶ 95 IDOC facilities were not and are not required to provide notice to a *distributor* of a publication. [308] ¶ 95.

a. The 2006 AD

Under the 2006 AD, when a publication review officer ("PRO") began a preliminary review process of a given publication, they were required to send a "DOC 211" form to the publisher (if the publication came directly from the publisher, rather than a distributor) and the intended recipient of the publication to alert both parties of the review. *See* [308] ¶ 96; [326] ¶ 13. The PRO was required to note on the DOC 211 form the rationale for the review and to tell the publisher that the publication was undergoing a review; the DOC 211 form did not tell either the publisher or the intended recipient that the publication had been censored or that a final determination had been made. [308] ¶ 96. Neither the 2006 AD nor the DOC 211 form required that a publisher be notified of the specific parts or pages of the publication that were potentially objectionable. [308] ¶ 97. If after receiving a DOC 211 form a publisher submitted a timely objection, the 2006 AD required that a PRO at the same facility conduct a final review within 30 days.

The PRO conducting the final review was required to make a final recommendation to either approve, disapprove, or conditionally approve the publication using a "DOC 212" form. [308] ¶ 98. The PRO's recommendation then went to the warden of the facility. [308] ¶ 98. If the warden did not think the publication should have been withheld, the reviewing PRO was to immediately forward the publication to its intended recipient. [326] ¶ 14. If the warden thought the publication should have

been disapproved or conditionally approved, the warden was to send the publication to the Central Publications Review Committee ("CPRC") for review. [308] ¶ 98. Regardless of the CPRC's decision, however, the warden retained the final say on censorship. [308] ¶ 99. The 2006 AD did not allow a publisher to appeal a censorship decision; it only allowed for a publisher to file an objection after receiving a DOC 211 form indicating that a publication was being reviewed. [308] ¶ 99. Further, a publisher would not receive notice of the final censorship decision unless the prisoner to whom the publication was mailed challenged the DOC 212 censorship determination. [308] ¶ 100.

While the 2006 AD was in effect, each IDOC facility had their own list of approved, disapproved, and conditionally approved publications. [308] ¶ 101. The 2006 AD further specified that publications could be censored if, among other things, the publication was "obscene," "include[d] sexually explicit material that by its nature or content poses a threat to security, good order of the facility, or discipline or it facilitates criminal activity," or was "otherwise detrimental to security, good order of the facility, rehabilitation or discipline, or it might facilitate criminal activity or be detrimental to mental health." Pls. Ex. 92.

### b. The 2019 AD

Under the 2019 AD, the review and notification process for censored materials were similar in large part to the 2006 AD. If a warden concurred with a PRO's recommendation to conditionally approve or disapprove the publication, the prisoner was notified using a revised DOC 212 form. [308] ¶ 102. The prisoner then had 14

5

days to return the DOC 212 form and indicate whether or he or she wanted the CPRC to review the publication. [308] ¶ 103. If the prisoner actively chose to waive review of the publication, the publication would be disposed of and the publisher would not receive notice. [308] ¶ 103. If the prisoner either requested review by the CPRC or failed to respond with their preferred course of action, the reviewing PRO was required to forward the DOC 212 form to the CPRC, and the CPRC Chairman was required to determine whether the publication should be approved, conditionally approved, or disapproved. [308] ¶ 104. If the CPRC disapproved or conditionally approved the publication *and* if the publication was mailed directly from the publisher, the publisher received notice of the censorship. [308] ¶ 105. The publisher then had 30 days to file an appeal. [308] ¶ 105. Unlike the 2006 AD, under the 2019 AD (and all relevant subsequent ADs), the CPRC is responsible for the final decision to censor any publications. [326] ¶¶ 9-10

The 2019 AD updated the categories of material under which a PRO could disapprove of a publication. In relevant part, publications could be censored if they "contain[ed] sexually explicit material," (the "Sexually Explicit Provision"), "contain[ed] security threat group (STG) material or depictions of hand signs or symbols that appear to be related to an STG and could promote or enhance the image of an STG within the facility or may be interpreted as legitimizing gang behavior," (the "STG Provision"), or if it was "detrimental to the security or good order of the facility," ("the Catch All Provision"). The 2019 AD did not define STGs, but it defined "sexually explicit material" as:

6

> "[A]ny publication that contains pictorial depictions of actual or simulated sexual acts including intercourse, oral sex or masturbation; any publication that by word or picture depicts or describes illegal activity of a sexual nature, sadomasochism, bestiality, sexual activity involving children (whether actual or perceived) or any publication that depicts or describes anything otherwise contrary to law. Publications that contain nudity without additional elements as provided above or publications that provide research or opinions on sexual health, reproductive issues or are scientific in nature shall not be considered sexually explicit."

In the "Mental Health Provision," the 2019 AD allowed for censorship of a publication when the publication was:

> "determined by a mental health professional or counselor to be detrimental to mental health or rehabilitation. Disapproval of publications under this criterion shall be made on a case-by-case basis and documentation of the mental health professional or counselor's determination shall be provided to the Central Publications Review Committee with the Publication Review Determination and Course of Action, DOC 0212"

c. The 2022 AD

Under the 2022 AD, at least three people — the PRO, the warden, and the chair of the CPRC — must agree to withhold a publication before publication can be censored. [326] ¶ 11. If the CPRC chair finds that the publication clearly violates the standards set forth the in the AD, the CPRC chair is to document those results in a DOC 212 form and send the form to the publisher. [326] ¶¶ 16-17. If the CPRC chair finds that there is a question as to whether the publication violates the AD's standards, the publication is brought before the entire CPRC for consideration. [326] ¶ 16. A publisher can appeal an unfavorable decision within 35 days of receiving notice, and the appeal is heard by the IDOC's Chief of Operations and the Chief of Programs.

7

[325] ¶ 17. The intended recipient does not have the opportunity to appeal a decision to disapprove or conditionally approve a publication. [326] ¶ 19.

The 2022 AD also contains modest changes to the categories of content that can be censored. The Sexually Explicit provision was expanded to create an exception for "news coverage on sexual assault, on sexual health, [and] reproductive issues." Pls. Ex. 95 at 2. Additionally, the Catch-All Provision and STG provision were combined into one larger provision, which prohibits publications that are "detrimental to the safety, security, or good order of the facility," and which includes publications that "[c]ontain content concerning security threat groups (STG) or depictions of handsigns or symbols that appear to be related to a STG and could promote or enhance the image of a STG within the facility or may be interpreted as legitimizing gang behavior." Pls. Ex. 95 at 4-5.[2]

### III.    PLN and CLN Censorship

Individuals who are incarcerated at IDOC facilities can freely subscribe to PLN and CLN. [326] ¶ 20. Between 2017 and 2019, HRDC had between 179 and 400 subscribers in IDOC facilities. [326] ¶ 22. The parties dispute the precise number of instances of censorship, but they appear to agree that the admissible evidence supports a finding of somewhere between 18 and 29 distinct instances of censorship. *See* [308] ¶¶ 81, 84.

There are IDOC forms or IDOC paperwork evidencing that the following issues of PLN and CLN were censored by various IDOC facilities. The chart below summarizes

---

[2] The 2022 AD catch-all provision contains three other examples of material that is detrimental to the safety, security, or good order of the facility, but those are not relevant in this action.

the issues relevant to this case, the facility or facilities at which the issues were purportedly censored, and whether HRDC received notice of the censorship.

| No. | Issue | Date | Facility | Notice Received |
|---|---|---|---|---|
| 1. | PLN Vol. 25, No. 26 | June 2014 | Menard | Yes |
| 2. | PLN Vol. 26, No. 11 | November 2015 | Menard | Yes |
| 3. | PLN Vol. 27, No. 3 | March 2016 | Decatur | Yes |
| 4. | PLN Vol. 27, No. 6 | June 2016 | Menard | Yes |
| 5. | PLN Vol. 27, No. 7 | July 2016 | Western Illinois | No |
| 6. | PLN Vol. 27, No. 11 | November 2016 | Menard | Yes |
| 7. | PLN Vol. 28, No. 1 | January 2017 | Vienna and Big Muddy[3] | Yes |
| 8. | PLN Vol. 28, No. 2 | February 2017 | Big Muddy | No |
| 9. | PLN Vol. 28, No. 3 | March 2017 | Big Muddy | No |
| 10. | PLN Vol. 28, No. 4 | April 2017 | Big Muddy | No |
| 11. | PLN Vol. 28, No. 8 | August 2017 | Pontiac, Menard, Robinson, and Stateville | No |
| 12. | PLN Vol. 28, No. 10 | October 2017 | Southwestern and Robinson | No |
| 13. | PLN Vol. 29, No. 1 | January 2018 | Menard | No |
| 14. | PLN Vol. 29, No. 2 | February 2018 | Big Muddy | No |
| 15. | PLN Vol. 29, No. 3 | March 2018 | Big Muddy | No |
| 16. | PLN Vol. 29, No. 5 | May 2018 | Big Muddy | No |
| 17. | PLN Vol. 29, No. 6 | June 2018 | Big Muddy | No |
| 18. | PLN Vol. 29, No. 7 | July 2018 | Big Muddy | No |
| 19. | PLN Vol. 29, No. 8 | August 2018 | Western Illinois and Big Muddy | Yes |

[3] The parties dispute PLN Vol. 28, No. 1. In their response to Plaintiff's statement of facts, Defendants suggest that there is no evidence that the issue was censored at *any* IDOC facilities. *See* [308] ¶ 82 ("Disputed that PLN Vol. 28, No. 1 (January 2017) was withheld in whole or in part from any individual in custody in any IDOC facility, as the evidence cited in subpart vii does not support this proposition."). However, elsewhere in their response, Defendants admit that the issue was in fact censored at Vienna and Big Muddy. *See* [308] ¶¶ 91, 135. Plaintiffs argue that it was also censored at Menard, but the evidence does not support that proposition. *See* Plaintiff's Ex. 54. Because Defendants do not dispute that the issue was withheld at Big Muddy and Vienna, the Court will consider that fact to be undisputed purposes of summary judgment.

9

| 20. | PLN Vol. 30, No. 11 | November 2019 | Menard[4] | Disputed[5] |
| 21. | CLN Vol. 1, No. 10 | September 2018 | Western Illinois and Saul Berry | Disputed[6] |

After cross-motions for summary judgment were briefed, HRDC filed an additional statement of facts that detailed declarations from six inmates at various IDOC facilities who claimed to have not received HRDC publications in 2024. [338]. There are genuine disputes of fact as to whether any IDOC employees or any of the named defendants censored those publications or otherwise caused the inmates to not receive the publications. *See* [351].

## IV. Defendants

The Defendants in this action can be broadly categorized as either "Director Defendants," "Warden Defendants," or "Publication Review Officers and Staff [PRO] Defendants." Director Defendants were the highest ranking IDOC officials and generally had responsibility for managing IDOC policies and ensuring their compliance with the law. [308] ¶¶ 6-11. Warden Defendants include wardens at various IDOC facilities, and the degree to which they had responsibility over the publication review process at their facilities varied. *See* [308] ¶¶ 12-58. PRO Defendants were responsible for reviewing and censoring publications received at their respective IDOC facilities. [308] ¶¶ 59 – 80. The following chart identifies the defendants by name, role, facility and the relevant years they worked at that facility.

---

[4] The parties dispute whether this issue was censored at Taylorville. [308] ¶ 155.
[5] *See* [308] ¶ 155.
[6] *See* [308] ¶ 156.

| Defendant | Role | Facility | Relevant Timeframe |
|-----------|------|----------|---------------------|
| Jeffreys[7] | Director | All Facilities | June 2019 – June 2021 (Acting Director); June 2021 – April 2023 (Director) |
| Baldwin | Director | All Facilities | August 2015 – May 2019 |
| Butler | Warden | Menard | 2014 – 2016 |
| Dennison | Warden | Shawnee | March 2016 – June 2016 (Acting Warden); June 2016 – January 2020 (Warden) |
| Dorethy | Warden | Hill | 2014 – 2020 |
| Gomez | Warden | Sheridan, Stateville | 2016 – 2020 (Sheridan); 2020 – Present (Stateville) |
| Hansbro | Warden | Decatur | 2010 – 2018 |
| Jaimet | Warden | Pinckneyville | January 2017 – June 2018 |
| Lashbrook | Warden | Menard | January 2017 – February 2019 |
| Melvin | Warden | Pontiac | 2015 – 2017 |
| Pfister | Warden | Pontiac; Stateville | 2011 – 2015 (Pontiac); 2015 – 2018, 2019 – 2020 (Stateville) |
| Rains | Warden | Robinson | 2015 – 2016 (Assistant Warden); 2016 – 2018 (Warden) |
| Sullivan | Warden | Big Muddy | 2017 – 2020 |
| Swalls | Warden | Vienna | April 2017 – January 2020 |
| Watson | Warden | Western Illinois | April 2017 – January 2020 |
| Anderson | PRO | Western Illinois | 2010 – 2017 |
| Bradley | PRO | Menard | November 2015 – April 2017 |
| Carter | PRO | Decatur | 2014 – 2018 |
| Rose | PRO | Menard | 2012 – 2016 |
| Scott | PRO | Menard | 2015 – 2018[8] |
| Shemonic | PRO | Menard | 2009 – 2012 (PRO); 2012 – 2018 (CPRC) |

**ANALYSIS**

---

[7] Pursuant to Fed.R.Civ.Pro. 25(d), Jeffreys' successor, Ms. Latoya Hughes, is substituted as a party in her official capacity.

[8] Scott served as a PRO temporarily and non-continuously during this period. [308] ¶ 74.

In Counts I and II of the second amended complaint, HRDC alleges the 2006 AD, 2019 AD, and 2022 AD violate the First and Fourteenth Amendment facially and as applied to HRDC, respectively. The parties moved for summary judgment on both counts. Defendants raise several threshold arguments.

## I.     Standing for Injunctive and Declaratory Relief

HRDC argues the 2022 AD's prohibition on STG Provision and Sexually Explicit Material Provision both violate the First Amendment. Defendant argues that HRDC has not established that any of its publications were censored pursuant to either of those provisions, and that as a result HRDC lacks the injury necessary for Article III standing. The Court disagrees.

Standing exists (1) "when the plaintiff suffers an actual or impending injury;" (2) "the injury is caused by the defendants' acts;" and (3) "a judicial decision in the plaintiff's favor would redress the injury." *Ezell v. City of Chicago*, 651 F.3d 684, 694-95 (7th Cir. 2011). But "standing rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024). In *Speech First,* the Seventh Circuit acknowledged two different ways that a plaintiff can establish standing in a First Amendment action prior to any actual censorship occurring. "First, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020)

(citing *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012)). "Second, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* (citing *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012)).

HRDC has established standing to challenge the STG Provision of the 2022 AD under the first of the *Speech First* methods. Two of Defendants' own experts indicated they would censor HRDC publications related to gang activity. Pls. Ex. 140 at 57; Def. Ex. 6 at 15. Defendants themselves have argued that HRDC may need to "edit its materials to avoid violating IDOC policy." [306] at 23. HRDC has thus established it intends "to engage in a course of conduct arguably affected by [the 2022 AD's STG policy], and that [it] faces a credible threat the policy will be enforced against" it. *Speech First*, 968 F.3d at 638.

Conversely, HRDC has not established that it faces a credible threat of being censored under the Sexually Explicit Provision. There is no admissible evidence in the record suggesting that any of HRDC's publications have been censored pursuant to this provision. The parties agree that Defendants have censored at least some publications at Big Muddy that featured pictures of women (including one advertisement for a post-conviction law firm featuring a fully clothed female lawyer) as being "inappropriate." Defendants insist that this advertisement was censored not under the Sexually Explicit Provision of the AD, but rather under the unchallenged Mental Health Provision that allows a mental health provider to censor materials deemed detrimental to the mental health of sexually dangerous persons ("SDPs").

Indeed, the only relevant publications were withheld from two SDPs at Big Muddy; other inmates at the same facility received the publications without issue. HRDC argues this is only a post-hoc rationalization for the censorship because the Mental Health Provision requires that the reviewing mental health provider document his or her decision in a DOC 211 or DOC 212 form, and Defendants have produced no evidence of any such documentation. But all of publications that HRDC alleges were censored under the Sexually Explicit Provision were published in 2017 or 2018, and the documentation requirement did not appear in the Mental Health Provision until the 2019 AD. As such, there is no admissible evidence in the record establishing that any of HRDC's publications were censored under the Sexually Explicit Provision, and there is no admissible evidence demonstrating that HRDC has reason to fear censorship under the Sexually Explicit Provision. HRDC does not have standing to seek injunctive or declaratory relief related to that provision.[9]

## II. Mootness of Injunctive and Declaratory Relief for Claims under the 2006 and 2019 ADs

Defendants argue that HRDC cannot receive declaratory or injunctive relief related to the 2006 AD or 2019 AD because they have been superseded by the 2022 AD. Claims for declaratory judgment are moot where "relief . . . would have no impact on the parties to th[e] suit," *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir.2001), and claims for injunctive relief are moot when the "event to be enjoined has come and gone." *Prison Legal News v. Fed. Bureau of Prisons*, 944

---

[9] Defendants also argue that HRDC does not have standing to challenge the "effectiveness" of the CPRC. But none of HRDC's claims are premised on the effectiveness of the CPRC. The Court does not address this issue further.

F.3d 868, 882 (10th Cir. 2019) (citing *Citizen Ctr. v. Gessler*, 770 F.3d 900, 907 (10th Cir. 2014)). In *Prison Legal News*, the Tenth Circuit rejected PLN's claims for declaratory and injunctive relief because the Bureau of Prisons delivered the at-issue publications to the inmates to whom they were sent. *Id*. at 882-83.

While the parties talk about mootness for injunctive and declaratory relief at times interchangeably, HRDC here brings so many claims against several polices that it is necessary to discuss each claim individually.

First, HRDC seeks a declaration that the 2019's STG Provision, Sexually Explicit Provision, and Catch All Provision are facially unconstitutional. The undisputed evidence shows that only one of HRDC's publications was censored while the 2019 AD was in effect. As will be discussed further below, there is no evidence that that article was censored pursuant to any of the provisions that HRDC takes issue with. As a result, relief declaring that these policies are unconstitutional "would be no more than an advisory opinion, which … federal courts are without constitutional authority to issue." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 627 (7th Cir. 2007). HRDC's facial attack on the constitutionality of these provisions is moot.

HRDC also seeks a declaration that the notice and appeal provisions in the 2006 AD and 2019 AD notice provisions are facially unconstitutional. There is evidence that HRDC was improperly deprived of notice and the opportunity to appeal while both ADs were in effect, and that the deprivation occurred as a direct result of the

challenged policies. *See, e.g.,* [308] ¶ 68. There is thus a live dispute between the parties and HRDC's claim for declaratory relief is not moot.

Finally, HRDC seeks injunctive relief as appropriate for the alleged First Amendment and Fourteenth Amendment violations while both the 2006 and 2019 ADs were in effect. As to the First Amendment violations—HRDC argues (1) that Defendants improperly censored certain publications, (2) that HRDC still has copies of those publications, and (3) if Defendants are so enjoined, HRDC can re-send the publications to their intended recipients. As to the Fourteenth Amendment violations, Defendants could be enjoined into allowing HRDC to appeal censorship decisions for which HRDC was denied notice. In other words, the event to be enjoined has not yet passed. HRDC's claims for injunctive relief are thus not moot.

## III.    Statute of Limitations

Defendants argue that any claims relating to censorship decisions made before February 13, 2016 are barred by the statute of limitations. The Court agrees.

The parties agree that because § 1983 does not contain a statute of limitations, Illinois federal courts apply the two-year statute of limitations set forth in 735 ILCS § 5/13-202 for personal injury claims in Illinois. *See Manuel 28 v. City of Joliet*, 903 F.3d 667, 668 (7th Cir. 2018). The parties dispute when or whether HRDC's claims began to accrue, however. Accrual occurs "when the plaintiff has a complete and present cause of action, . . . that is, when the plaintiff can file suit and obtain relief." *Id*. (quotations omitted).

HRDC argues that Defendants' First and Fourteenth Amendment violations constitute a "continuing violation" that delays accrual. "A violation is called 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct." *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001). HRDC relies on *Heard*, where the plaintiff-prisoner sued prison officials for inflicting cruel and unusual punishment by denying him medical care. *Id*. at 317. The district court held that the plaintiff's statute of limitations started to run as soon as he discovered that he had a medical problem that required attention, and the court dismissed the case because the plaintiff brought his action more than two years after the medical problem arose. *Id*. The Seventh Circuit reversed, reasoning that it is unreasonable to prevent a plaintiff from "reach[ing] back to his first [injury] by suing within the limitations period for the last" when the plaintiff alleges a "continuous series of events [that] gives rise to a continuing injury." *Id*. at 320. The court distinguished those kinds of claims from ones where "repeated events give rise to discrete injuries" and a plaintiff's statute of limitations begins to toll as soon as he has a discrete injury. *Id*.

Unlike the plaintiff in *Heard*, HRDC's injuries are clearly discrete and caused by repeated events. HRDC's argument that—as in *Heard*—it would be unreasonably burdensome to sue for every individual violation is belied by the fact that HRDC *has* sued for several individual violations. There is no reason that HRDC could not have

sued upon becoming aware of each challenged censorship decision. As a result, the statute of limitations bars any of HRDC's claims premised on events before February 13, 2016.

Defendants are entitled to summary judgment as it relates to HRDC's claims regarding PLN Vol. 25, No. 26 (June 2014) and PLN Vol. 26, No. 11 (November 2015) because HRDC admits to receiving notice of censorship for each issue. Further, because HRDC's only claims against Defendants Butler and Rose relate to censorship decisions from 2014 and 2015, they are dismissed from the litigation.

## IV. Merits

### a. First Amendment – 2022 AD Facial Challenges

The Supreme Court has held that "there is no question that publishers . . . have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). Any restriction on publishers' constitutional rights is only "valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). To determine whether a restriction is "reasonably related to legitimate penological interests," the Court must consider: (1) whether the regulation has a valid, rational connection to a legitimate governmental interest; (2) whether alternative means exist to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) any ready alternatives to the regulation. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). This is a "deferential standard" and courts must uphold the regulation "if it is reasonably related to legitimate penological interests." *Mauro v. Arpaio*, 188 F.3d

18

1054, 1058 (9th Cir. 1999) (citing *Turner,* 482 U.S. at 89-91). The first factor is the "ultimate question in any *Turner* analysis," *Nigl v. Litscher*, 940 F.3d 329, 333-34 (7th Cir. 2019); thus, it "can act as a threshold factor regardless which way it cuts." *Singer*, 593 F.3d at 534. Where "there is only minimal evidence suggesting that a prison's regulation is irrational, running through each factor at length is unnecessary." *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009)

### i. 2022 AD

HRDC argues that the Catch All Provision and the STG Provision are facially unconstitutional.[10] HRDC's primary argument is that both provisions are overbroad and unacceptably vague.[11] "In the First Amendment context, … a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep.'" *Prison Legal News v. Ryan*, 39 F.4th 1121, 1129 (9th Cir. 2022) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)) Likewise, vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech," and "can be thought of as one form of overbreadth, describing rules that are overbroad because their effect is to chill constitutionally protected activity." *Brown v. Kemp*, 86 F.4th 745, 771 (7th Cir. 2023).

---

[10] As stated previously, HRDC does not have standing to seek challenge the Sexually Explicit Provision contained in the 2022 AD, so HRDC's facial attack on the provision necessarily fails. *See Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) ("In a facial challenge . . . [t]he remedy is necessarily directed at the [policy] itself and *must* be injunctive or declaratory.") (emphasis in original).

[11] Courts generally view the question of overbreadth and vagueness in the context of the first *Turner* element. *See Couch v. Jabe*, 737 F. Supp. 2d 561, 565 (W.D. Va. 2010).

19

The Seventh Circuit has held that "[s]ome open-ended quality is essential if a prison is to have any guidelines; it is impossible to foresee all literature that may pose a threat to safety and security." *Borzych v. Frank*, 439 F.3d 388, 392 (7th Cir. 2006). The "overbreadth analysis . . . has little or [no scope] in civil litigation dealing with prisons' internal operations." *Id.*; *see also Koutnik v. Brown*, 456 F.3d 777, 782-83 (7th Cir. 2006) (citing *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir.1986)) (the overbreadth and vagueness doctrines "have only limited relevance to a sphere where the right of free speech is limited," as in prisons). And in each of these cases, the Seventh Circuit was responding to challengers from prisoners about their *own* First Amendment rights, not the rights of outside publishers or distributors to communicate with prisoners.

The parties disagree about what the 2022 AD provisions mean and whether they should be read separately or together. The relevant portion of the 2022 AD reads:

G. Standards for Publications
1. Publications shall not be disapproved solely because its content is religious, philosophical, political, social, legal, or sexual, or because the content is unpopular or repugnant.
2. Publications that meet one or more of the following criteria may be disapproved:
a. It contains sexually explicit material.
b. It is written in code.
c. It facilitates unauthorized communication between individuals in custody.
d. It blatantly encourages activities that may lead to the use of physical violence or group disruption.
e. It facilitates unauthorized organizational activity within the Department.
f. It overtly advocates or encourages violence, hatred, or group disruption.
g. It encourages or instructs in the commission of criminal activity as defined by Illinois and federal criminal laws.

**h. It is detrimental to the safety, security, or good order of the facility: This shall include, but is not limited to publications that:**

> (1) Depict or describe procedures for the construction or use of weapons, ammunition, bombs, or incendiary devices;
>
> (2) Depict or describe procedures for making alcoholic beverages or manufacturing drugs;
>
> (3) Depict, describe, or encourage methods of escape from correctional facilities or provides material that may assist in an escape attempt such as a detailed map of areas surrounding Illinois correctional facilities; or
>
> **(4) Contain content concerning security threat groups (STG) or depictions of hand signs or symbols that appear to be related to a STG and could promote or enhance the image of a STG within the facility or may be interpreted as legitimizing gang behavior.**

Pls. Ex. 95 at 4-5 (emphasis added). Section (G)(2)(h) is what the parties refer to as the Catch All Provision, and Section (G)(2)(h)(4) is the STG provision.

HRDC urges that the STG provision must be read separately and that it allows for material to be censored if it (a) "contain[s] content concerning [STGs] *or* [(b)] depictions of hand signs or symbols that appear to be related to a STG *and* [(c)] could promote or enhance the image of a STG within the facility *or* [(d)] may be interpreted as legitimizing gang behavior." [325] at 12. Under this interpretation, news articles that make only passing mention of gangs are prohibited. Conversely, Defendants argue publications will *only* be prohibited *if* they are also "detrimental" to the facility as contemplated under the Catch All Provision. Under Defendants' interpretation, material could thus only be censored under these provisions if they are (1) "detrimental to safety, security, or good order," and (2) could (a) "promote or enhance the image of a STG within the facility" or (b) might "legitimiz[e] gang behavior." The problem with Defendants' position is their own expert took a far wider view of the

provision. In his report, he wrote that he would censor a news article, based on this provision, only because it mentioned a gang leader by name. Def. Ex. 6 at 15. In other words, he seemed to adopt HRDC's reading of the provision rather than Defendants'.

Because the parties have proffered equally plausible questions regarding the meaning of these two provisions, and because accepting one or the other would mean censoring a significantly disparate manner of publications, the Court finds that both provisions are unconstitutionally vague. When "[p]ersons of common intelligence would be required to guess at a phrase's meaning and differ as to how [a] regulation should be enforced," that regulation is impermissibly vague. *Int'l Soc. for Krishna Consciousness v. Rochford*, 585 F.2d 263, 268 (7th Cir. 1978). A publisher cannot be expected to read the challenged provisions and understand what content they prohibit. Because the provisions are impermissibly vague on their face, the Court declines to address the remaining *Turner* factors.

### b. First Amendment – As-Applied Challenges

Having addressed HRDC's First Amendment facial attack against the 2022 AD, the Court turns next to the specific instances of censorship, first discussing Defendants' stated reason for censoring the articles and then HRDC's arguments regarding the impropriety of that censorship.[12]

   i. PLN Vol 25, No. 6 (June 2014), PLN Vol. 26 No. 11 (November 2015)

---

[12] HRDC argues that several articles in addition to those discussed here have been censored. However, to support those claims, HRDC relies only on inadmissible hearsay, which is not sufficient to create a dispute of fact. *Balle v. Kennedy*, 73 F.4th 545, 551 (7th Cir. 2023).

As discussed above, any challenges related to these publications are barred by the statute of limitations. HRDC's as-applied challenges related to these publications fails.

      ii.  PLN Vol. 27, No. 6 (June 2016), PLN Vol. 27, No. 11 (November 2016), PLN Vol. 28, No. 1 (January 2017), PLN Vol. 28, No. 8 (August 2017), PLN Vol. 28, No. 10 (October 2017), PLN Vol. 29, No. 1 (January 2018), PLN Vol. 29, No. 8 (August 2018); PLN Vol. 30, No. 11 (November 2019).

The June 2016 and January 2018 issues of *PLN* were censored at Menard and included articles about hunger strikes that occurred in IDOC facilities that successfully achieved changes in prison policies. Defendants' experts described how hunger strikes strain the resources of IDOC facilities and can cause dangerous disruptions. Another court in this circuit has found that the exact article in the June 2016 issue was properly withheld at Menard, reasoning that prisons have a legitimate government interest in maintaining the safety and security of IDOC facilities. *Kruger v. Lashbrook*, No. 18-CV-512-SMY, 2022 WL 5169472, at *4 (S.D. Ill. Oct. 5, 2022). The January 2018 issue also contained an article about a suicide committed by an inmate at an IDOC facility. Defendants argue that IDOC facilities have a legitimate penological interest in preventing information that could encourage more inmates to commit suicide.

The January 2017 issue of *PLN* was censored at Vienna, and the reviewer indicated it was censored because of an article depicting a prison riot. Three articles in the issue reference prison riots. Defendants argue that they have a legitimate interest in discouraging the spread of information about riots.

Three issues of *PLN* — the August 2017, October 2017, and August 2018 issues — were censored because they contain articles describing various lawsuits against IDOC officials. Two of the issues contain details of IDOC guards beating inmates (one of the inmates was killed in the attack) and the other issue describes how IDOC guards stole an inmate's legal papers during a cell shakedown to deprive him of the opportunity to prepare for a post-conviction hearing.[13] Each of the articles name the IDOC guards and officials responsible, and at least some those guards or officials were still employed by the facilities where they were reported to have stolen from, beat, or killed inmates. Defendants argue that they were justified in withholding these issues because they could inflame tensions in IDOC facilities and create an unsafe environment, particularly at the facilities where the named correctional staff still worked.

The November 2019 issue of *PLN* was censored because it contained an issue covering a suicide committed by an inmate and named three IDOC staff members who engaged in misconduct. As with the previously discussed issues, Defendants argue that they were justified in withholding this issue because they have a legitimate interest in discouraging inmates from committing suicide and in protecting the safety of IDOC staff members.

---

[13] The Court is sensitive to the complexities of running a prison facility and is not qualified to mete out advice. But it strikes the Court as bordering on the absurd to think that censoring this type of information is effective. Inmates are aware of correctional staff who are accused of engaging in misconduct. They have to be. This case is about the HRDC's First Amendment right to report on these incidents. The Court finds that the law protects the defendants' censorship. But the obvious policy matter raised, not presented here, is the decision to continue employing correctional staff accused of such egregious misconduct in positions where they have contact with inmates. That seems, from an outside observer's view, far more likely to lead to be "detrimental to the safety, security of good order of the facility." Pls. Ex. 92.

24

HRDC makes several arguments regarding these issues, none of which rise to the level of a First Amendment violation under existing law. First, HRDC argues that various IDOC facilities violated the First Amendment by inconsistently censoring publications at different facilities. But "[s]ome open-ended quality is essential if a prison is to have any guidelines; it is impossible to foresee all literature that may pose a threat to safety and security." *Borzych*, 439 F.3d at 392. The fact that IDOC officials at different facilities reviewed certain publications and come to different determinations about their permissibility does not, on its own, establish that HRDC's rights were violated.

Second, HRDC argues that IDOC's publication review policy is "undermined by its inconsistent television policy," which allows prisoners to watch television in housing units without any content-based restrictions. [299] at 15. But the Seventh Circuit has repeatedly rejected this argument, and HRDC does nothing to distinguish its argument here from this binding precedent. *See Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009); *Bailey v. Stover*, 766 F. App'x 399, 401-02 (7th Cir. 2019).

Third, HRDC argues that when IDOC officials remove a page from a publication because only one side of it has objectionable content, the removal of the non-objectionable other side of the page constitutes a constitutional violation. But the Supreme Court has held that when prison officials determine one page in a publication is objectionable, the officials are justified in censoring the *entire* publication. *Throneburgh*, 490 U.S. at 418-19. HRDC counters that this practice nonetheless violates IDOC's own policies. That may be true, but as HRDC

acknowledges, "failure to follow an internal regulation is not a constitutional violation per se." [325] at 23. The question before the Court is whether Defendants violated the First or Fourteenth Amendments, not whether Defendants violated their own policies.

Finally, HRDC contends that because the challenged articles present "factual events in an objective manner and do not incite or encourage any misconduct," their "censorship under the guise of safety and security [is] not rationally related to a legitimate interest and fail the *Turner* standard." While the Court is sympathetic to this argument, it is not based in law. The question is not the censored publications *actually threatened* the safety and security of the prison, but rather whether it was "reasonable for defendants to perceive the newsletter as a potential threat to [safety] and security." *Van den Bosch v. Raemisch*, 658 F.3d 778, 788 (7th Cir. 2011). "Plaintiff's disagreement with [Defendants'] assessment is insufficient to establish that confiscation of the [publications] was not reasonably related to legitimate penological interests." *Id.*; *see also Thornburgh*, 490 U.S. at 417 ("We agree that it is rational … to exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time."). Indeed, the Seventh Circuit has repeatedly signaled that prison officials have the latitude to restrict publications far more anodyne than those at issue here. *See Singer v. Raemisch,* 593 F.3d 529 (7th Cir. 2010) (confiscation of publications concerning the roleplaying game "Dungeons & Dragons" because the prison determined that the game promoted

26

violence and "escapist behavior" was related to the prison's interests in maintaining institutional security); *Johnson v. Frank,* 509 F.3d 389, 391–92 (7th Cir. 2007) (upholding an outright ban on all individual commercially published photographs in Wisconsin prisons because of the prisons' legitimate interest in cutting down on the administrative costs required to review them); *Van den Bosch*, 658 F.3d at 788 (holding that prison officials were justified in censoring passages in a newsletter that was critical of a parole committee because the newsletter would encourage distrust of prison staff and threaten security).

      iii.   PLN Vol. 28, No. 2 (February 2017), PLN Vol. 28, No. 3 (March 2017), PLN Vol. 28, No. 4 (April 2017), PLN Vol. 29, No. 2 (February 2018), PLN Vol. 29, No. 3 (March 2018), PLN Vol. 29, No. 5 (May 2018), PLN Vol. 29, No. 6 (June 2018), PLN Vol. 29, No. 7 (July 2018), PLN Vol. 29, No. 8 (August 2018)

HRDC argues that several of its publications were improperly withheld at Big Muddy[14] without justification. Defendants argue that the articles were censored pursuant the AD's Mental Health Provision, which allows facilities to conduct individualized reviews of publications sent to inmates who have been committed as SDPs. Defendants note that although these issues were sent to multiple inmates at Big Muddy, there is only evidence that Big Muddy censored the issues that were sent to an SDP. However, Defendants also admit that "[i]n each of these cases, Big Muddy personnel did not complete the appropriate DOC 211 or DOC 212 forms, so we do not have a written explanation for the censorship." [306] at 37. Defendants urge that it is nonetheless "a reasonable conclusion" that these issues were withheld pursuant to

---

[14] As indicated above, PLN Vol. 29, No. 8 was censored at both Big Muddy and Western Illinois for different reasons.

the Mental Health Provision. *Id*. The Court is inclined to agree, but that is not the standard that Defendants need to meet to prevail on summary judgment, where the Court must view "all evidence in the light most favorable" to HRDC. *City of Chi. v. Equte LLC*, 2023 WL 6173593 at *3 (N.D. Ill. Sept. 19, 2023). The Court thus declines to grant either party summary judgment on claims related to these issues because there is a genuine dispute of fact as to why they were censored.

iv.  PLN Vol. 27, No. 3 (March 2016), PLN Vol. 27, No. 7 (July 2016),
CLN Vol. 1 No. 10 (September 2018)

Defendants admit that each of these issues was censored by mistake and that the censorship was not rationally related to any penological interest. As a result, HRDC is entitled to summary judgment as it relates its First Amendment as-applied challenge to each of these issues.

### c.  Fourteenth Amendment Facial Challenges

Plaintiffs argue that the notice and appeal provisions in the 2006 AD, 2019 AD, and 2022 ADs are facially unconstitutional. As a general matter, the Fourteenth Amendment requires: (1) "the author of [the publication] be given a reasonable opportunity to protest [the censorship] decision" and (2) "complaints be referred to a prison official other than the person who originally disapproved the [publication]." *Procunier v. Martinez*, 416 U.S. 396, 418-19 (1974), overruled on other grounds by *Thornburgh*, 490 U.S. 401; see also *Prison Legal News v. Cnty. of Cook*, 2016 WL 6833977, at *10 (N.D. Ill. Nov. 21, 2016) ("[N]umerous circuits have held that publishers have due process rights when a prison rejects their publications.") (collecting cases); *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004).

i. 2006 AD

HRDC argues that the 2006 AD's notice provisions and appeal provisions were both facially unconstitutional. The Court agrees.

As to its notice provision – the 2006 AD only required a PRO to send notice to a publisher if the publisher determined that the publication was "questionable" and that the publication was being reviewed. The 2006 AD did *not* require a PRO or any other entity to provide notice to a publisher when a final censorship decision was made. "Due process requires that the decision to censor inmate mail must be accompanied by 'minimum procedural safeguards.'" *Miller v. Downey*, 915 F.3d 460, 466 (7th Cir. 2019) (quoting *Procunier*, 416 U.S. at 417). Courts have not provided an overly robust definition of what it means to provide minimum procedural safeguards, but Defendants argue that the 2006 AD satisfies the Fourteenth Amendment's requirements by "giving the author of the publication a reasonable opportunity to protest the decision." [306] at 27. The Court does not see how that can be true given that the 2006 AD does not require alerting a publisher that a censorship decision has even been *made*.

The notice provision also fails to meet its constitutional requirements because it did not require that a publisher be told why its publication was censored. *See Prison Legal News v. Cnty. of San Diego*, 2015 U.S. Dist. LEXIS 83417, at *31 (S.D. Cal. May 7, 2015) (finding notice stating "RETURN TO SENDER" or "UNACCEPTABLE MAIL" was insufficient because "[t]his renders it impossible for PLN to challenge the basis of the refusals"); *Johnson v. Raemisch*, 557 F. Supp. 2d 964, 972 (W.D. Wis.

2008) (finding that the prison's notice that a newsletter "poses a threat to the security, orderly operation, discipline/safety of the institution" was insufficient because defendants failed to "identif[y] any security justification for the censorship"). The notice requirements in the 2006 AD are thus facially unconstitutional.

The 2006 AD's appeal provision is similarly unconstitutional because it did not require that an appeal be handled by a an official other than the original censor. *See Smith v. Donohue*, 977 F.2d 585 (7th Cir. 1992) ("[T]he Supreme Court stated that the decision to censor inmate mail must be accompanied by minimum procedural safeguards, including notice of censorship to the sender and recipient of the mail, and an opportunity to protest to an official other than the censor.")

### ii. 2019 AD

HRDC contends that the 2019's notice requirements were likewise facially unconstitutional because IDOC facilities were only required to give publishers notice of censorship if the intended recipient waived additional review by the CPRC. Defendants argue that if a prisoner waives review of a publication, they are effectively communicating that they do not wish to receive the publication and that it becomes unsolicited mail. Defendants note that the Supreme Court has not affirmed any right to send unsolicited mail and that two courts have rejected Fourteenth Amendment claims premised on a prison's failing to provide notice when censored mail is unsolicited. *See Hughbanks v. Dooley*, 788 F. Supp. 2d 988, 999 (D.S.D. 2011); *Alcala v. Calderon*, No. C 95-3329 TEH, 1997 WL 446234, at *10 (N.D. Cal. July 24, 1997). But Defendants cite no authority for the proposition that an inmate choosing to not

have a publication reviewed converts it into unsolicited mail. HRDC is seeking to protect *its* Fourteenth Amendment rights, not the intended recipients', and it is not clear to the Court why an inmate's decision not to pursue review would extinguish a publisher's right to due process. The 2019 AD is thus facially unconstitutional.

HRDC also argues that the 2019 AD was facially unconstitutional because, like the 2006 AD, the same person who made the original censorship decision was also responsible for reviewing any appeal. Under the 2019 AD, it is undisputed the final censorship decision was made by the Chair of the CPRC. [308] ¶ 104. If that decision was appealed, it is undisputed that the appeal was heard by "the CPRC." [308] ¶ 105. The parties have not explained who sits on the CPRC or what the Chair's role on the CPRC is with sufficient clarity to allow the Court to determine whether this process violates a publisher's rights to due process. The Court thus declines to find that the appeal provision of the 2019 AD is facially unconstitutional.

### iii. 2022 AD

HRDC argues that the 2022 AD is still facially unconstitutional because it provides notice only for censored publications received directly from a publisher, rather than publications received from a distributor. HRDC's argument requires finding that a distributor has the same due process protections as a publisher. In support of its argument, HRDC principally relies on *Martin v. Kelley*, where the Sixth Circuit held that the sender of a letter to a prisoner was entitled to notice and the opportunity to appeal a censorship decision. 803 F.2d 236, 243-44 (6th Cir. 1986). This does not persuade. It strikes the Court that an author's interests in communicating with a

31

prisoner are closer to — and perhaps even stronger than — those of a publisher rather than those of a distributor. Because HRDC cites no authority suggesting that *Procunier*'s due process protections extend to distributors, the Court declines to find that the 2022 AD is facially unconstitutional on this basis.

### d. Fourteenth Amendment As-Applied Challenges

The Court next turns to the specific instances where HRDC alleges that they did not receive notice of a censorship decision. Defendants argue that the undisputed facts show that notice was not provided in only three instances. Plaintiffs argue that Defendants failed to provide notice in 22 instances. Based on the Court's review of the parties' statements of fact, the parties agree that there is no evidence in the record indicating that notice was provided for the following 16 instances of censorship:

| No. | Issue | Date | Facility | Record Cite |
|---|---|---|---|---|
| 1 | PLN Vol. 27, No. 7 | July 2016 | Western Illinois | [308] ¶ 89 |
| 2 | PLN Vol. 28, No. 2 | February 2017 | Big Muddy | [308] ¶ 136 |
| 3 | PLN Vol. 28, No. 3 | March 2017 | Big Muddy | [308] ¶ 137 |
| 4 | PLN Vol. 28, No. 4 | April 2017 | Big Muddy | [308] ¶ 138 |
| 5 - 8 | PLN Vol. 28, No. 8 | August 2017 | Pontiac, Menard, Robinson, and Stateville | [308] ¶ 140 |
| 9-10 | PLN Vol. 28, No. 10 | October 2017 | Southwestern and Robinson | [308] ¶ 142 |
| 11 | PLN Vol. 29, No. 1 | January 2018 | Menard | [308] ¶ 143 |
| 12 | PLN Vol. 29, No. 2 | February 2018 | Big Muddy | [308] ¶ 148 |
| 13 | PLN Vol. 29, No. 3 | March 2018 | Big Muddy | [308] ¶ 149 |
| 14 | PLN Vol. 29, No. 5 | May 2018 | Big Muddy | [308] ¶ 150 |
| 15 | PLN Vol. 29, No. 6 | June 2018 | Big Muddy | [308] ¶ 151 |
| 16 | PLN Vol. 29, No. 7 | July 2018 | Big Muddy | [308] ¶ 152 |

In each of the above instances, Defendants admit that they censored at least part of an article and either (1) they did not provide notice of the censorship; or (2) there is no admissible evidence in the record upon which they could prove they provided notice of the censorship. HRDC is entitled to summary judgment as it relates to their Fourteenth Amendment as-applied claims for the above 16 instances of censorship.

### e. Damages

In addition to injunctive and declaratory relief, HRDC seeks damages against all Defendants in their individual capacity. "A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation." *Matz v. Klotka*, 769 F. 3d 517, 528 (7th Cir. 2014). To establish individual liability, the individual must have "caused or participated in an alleged constitutional deprivation." *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986) (quoting *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983)). Neither negligence nor gross negligence is enough. *Beaman v. Souk*, 7 F. Supp. 3d 805, 826 (C.D. Ill. 2014), *aff'd sub nom. Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) (citing *Slade v. Bd. of Sch. Dirs.,* 702 F.3d 1027, 1032 (7th Cir.2012); *see also Waubanascum v. Shawano County*, 416 F.3d 658, 670 (7th Cir. 2005); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) ("[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable . . . [t]he supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." (quotations omitted); *Hill v. Superior Ct. of Lake Cnty.*, No. 2:07-CV-356, 2007 WL 3256667, at

*3 (N.D. Ind. Nov. 2, 2007) ("Neither the Constitution nor § 1983 imposes liability for monetary damages for mistakes or negligence.").

Relatedly, Defendants argue that they are all protected from any claims for monetary relief by qualified immunity. Qualified immunity applies whether a government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (internal quotation marks omitted); see *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." (internal quotation marks omitted)).

The qualified immunity analysis contains a two-pronged inquiry. "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a

34

violation of a constitutional right." *Pearson*, 555 U.S. at 232 (internal citations omitted). "Second, ... the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id*. "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry. *Id*. "The qualified immunity inquiry is a pure question of law." *Martin v. Lane*, No. 85 C 0734, 1987 WL 17135, at *2 (N.D. Ill. Sept. 16, 1987).

With that legal framework in mind, the Court first addresses HRDC's claims for monetary relief. The undisputed evidence shows that just three articles were wrongfully censored over a period of several years. As the Court will explain in greater detail below, the evidence does not support a finding that any of the Defendants acted with a mental state beyond that of gross negligence in mistakenly censoring a small number of articles or in failing to provide notice of their censorship. Thus, even without considering qualified immunity, none of the individual Defendants are liable for compensatory damages under § 1983.

However, individuals who were responsible for violating HRDC's rights are nonetheless liable for nominal damages. *See Hodges v. Rios,* No. 99 C 4137, 2000 WL 1700172, at *7 (N.D. Ill. Nov. 9, 2000) ("In an action brought pursuant to Section 1983, even when a litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right.") (quotations omitted). Further, qualified immunity does not preclude an award of nominal damages because the rights violated—HRDC's First Amendment right to communicate with inmates and Fourteenth Amendment right to receive notice and

appeal censorship decisions—were governed by clearly established law. *See, e.g.*, *Smith v. Donohue*, 977 F.2d 585 (7th Cir. 1992); *Hum. Rts. Def. Ctr. v. Baxter Cnty. Ark.*, 999 F.3d 1160, 1167 (8th Cir. 2021); *Montcalm Pub. Corp. v. Beck*, 80 F.3d 105, 106, 109 (4th Cir. 1996); *Jacklovich v. Simmons*, 392 F.3d at 433; *Prison Legal News v. Stolle*, 319 F.Supp.3d 830, 850 (E.D. Va. 2015); *Hum. Rts. Def. Ctr. v. Ishee*, 2024 WL 1309186 at *8 (E.D.N.C. Mar. 27, 2024); *Prison Legal News v. Cook*, 238 F.3d 1145, 1153 (9th Cir. 2001); *Martin v. Kelly*, 803 F.2d 236, 243-44 (6th Cir. 1986); *Bonner v. Outlaw*, 552 F.3d 673, 677 (8th Cir. 2009); *Lane v. Lombardi*, 2012 WL 5873577 at *2-5 (W.D. Mo. Nov. 15, 2012).

Having established the rules by which each Defendant can be found liable, the Court addresses each Defendant individually:

- Defendant Dennison served as a warden intermittently at Shawnee and Pinckneyville from 2016 through 2020. There is no evidence in the record upon which a jury could find any instances of improper censorship or due process violations at either facility during that time. Defendant Dennison is thus entitled to summary judgment and is dismissed from the litigation.

- Defendant Dorethy served as warden of Hill from 2014 through 2020. There is no evidence in the record upon which a jury could find any instances of improper censorship or due process violations at that facility during that time. Defendant Hill is thus entitled to summary judgment and is dismissed from the litigation.

36

- Defendant Gomez served as warden at Sheridan from 2016 through 2020 and at Stateville in early 2020. There is no evidence in the record upon which a jury could find any instances of improper censorship or due process violations at either facility during that time. Defendant Gomez is thus entitled to summary judgment and is dismissed from the litigation.

- Defendant Jaimet served as warden at Pinckneyville from January 2017 through June 2018. There is no evidence in the record upon which a jury could find any instances of improper censorship or due process violations at that facility during that time. Defendant Jaimet is thus entitled to summary judgment and is dismissed from the litigation.

- Defendant Swalls served as the warden at Vienna from April 2017 – January 2020 during which time the January 2017 issue of PLN was censored. For the reasons discussed above, censorship of this issue was justified under the *Turner* standard. Swalls is thus entitled to summary judgment as to HRDC's First Amendment claim. There is no evidence in the record upon which a jury could find any instances of due process violations at Vienna during Swalls's tenure. Defendant Swalls is thus entitled to summary judgment and is dismissed from the litigation.

- Defendant Butler served as warden of Menard from 2014 through 2016. As discussed above, any claims against Butler stem from censorship that occurred beyond the statute of limitations period. Butler is thus entitled to summary judgment and is dismissed from the litigation.

- Defendant Hansbro served as warden at Decatur from 2010 through 2018 during which time PLN Vol. 27, No. 3 was censored. Defendants concede that censorship of this article was not justified but argue it was a reasonable mistake. The Court agrees; the evidence reflects only one single instance where Watson was responsible for an incorrect censorship decision. The evidence does not support a finding that Hansbro acted with a mental state beyond gross negligence. As a result, although HRDC is entitled to declaratory and injunctive relief related to the censorship of PLN Vol. 27, No. 3, HRDC is not entitled to monetary relief beyond nominal damages. There is also no evidence in the record of any due process violations at Decatur during this time. As a result, Hansbro is entitled to summary judgment on HRDC's Fourteenth Amendment claims.

- Defendant Carter served as a PRO at Decatur from 2014 through 2018. During that time, Defendants concede that Carter wrongly censored PLN Vol. 27, No. 3. However, the unrebutted evidence shows that Carter realized she wrongly censored the issue a month later and quickly worked to fix her error. As a result, HRDC is entitled only to declaratory relief related to this censorship and not monetary relief beyond nominal damages. Further, there is no evidence that Carter was involved in any due process violations during her time at Decatur. Carter is thus entitled to summary judgment as to HRDC's Fourteenth Amendment claim against her.

38

- Defendant Lashbrook served as warden at Menard from January 2017 through February 2019 during which time PLN Vol. 28, No. 8 and Vol. 29, No. 1 were censored.[15] For the reasons discussed above, censorship of both issues was justified under the *Turner* standard. Lashbrook is thus entitled to summary judgment as to HRDC's First Amendment claim. However, the undisputed facts show that HRDC did not receive notice of either instance of censorship. But the unrebutted evidence shows that Lashbrook "had no role in providing notice to publishers." [308] ¶ 35. Lashbrook thus cannot be liable for monetary relief. HRDC is entitled only to declaratory relief as to HRDC's Fourteenth Amendment claim against Lashbrook.

- Defendant Bradley served as a PRO at Menard from November 2015 – April 2017. Bradley was responsible for initial censorship decisions regarding PLN Vol. 27, No. 6 and PLN Vol. 27, No. 11. For the reasons discussed above, censorship of both of these issues was justified under the *Turner* standard. As a result, Bradley is entitled to summary judgment in HRDC's First Amendment claim against him.[16]

- Defendant Rose served as a PRO at Menard from 2012 through 2016. Rose was involved in the initial censorship decisions for PLN Vol. 25, No. 26 and PLN. Vol. 26, No. 11. As discussed above, both instances of censorship

---

[15] Defendants appear to dispute whether Lashbrook had any personal involvement with censorship of PLN Vol. 28, No. 8. *See* [306] Even if she did, she would nonetheless be entitled to summary judgment because censorship was justified under *Turner*.

[16] HRDC does not appear to seek summary judgment against Bradley for any Fourteenth Amendment violations. *See* [299] at 27.

occurred outside of the statute of limitations period. Rose is thus entitled to summary judgment as to Plaintiff's First Amendment claim against him.[17]

- Defendant Scott served as a PRO at Menard from 2015 – 2018. Scott was involved in the initial censorship decision for PLN Vol. 29, No. 1. As discussed above, censorship of this issue was justified under the *Turner* standard. As a result, Scott is entitled to summary judgment in HRDC's First Amendment claim against her. HRDC did not receive notice of PLN Vol. 29, No. 1's censorship. However, the evidence does not establish that Scott acted (or failed to act) with a mental state beyond gross negligence. Thus, HRDC is entitled only to declaratory relief and nominal damages in their Fourteenth Amendment claim against Scott.

- Defendant Shemonic served as a PRO at Menard from 2009 through 2012 and temporarily filled in for Defendant Bradley at Menard in 2016. During that time, she was involved in the censorship decision for PLN Vol. 27, No. 6. For the reasons discussed above, this this censorship was justified under the *Turner* standard. Further, there is no evidence that Shemonic was involved in any due process violations during her time at Menard. Shemonic is thus entitled to summary judgment as to HRDC's Fourteenth Amendment.

- Defendant Melvin served as warden at Pontiac from 2015 through 2018 during which time PLN Vol. 28, No. 8 was censored. However, for the

---

[17] HRDC does not appear to seek summary judgment against Rose for any Fourteenth Amendment violation violations. *See* [299] at 27.

reasons discussed above, this censorship was justified under the *Turner* standard. Melvin is thus entitled to summary judgment as to HRDC's First Amendment claim. Although the undisputed facts also show that HRDC did not receive notice of this censorship, HRDC provided no evidence of Melvin's personal involvement with or even knowledge about the notice process at Pontiac. Melvin is thus entitled to summary judgment as to HRDC's Fourteenth Amendment claim.

- Defendant Pfister served as warden at Stateville from 2015 through 2018 during which time PLN Vo. 28, No. 8 was censored. However, for the reasons discussed above, this censorship was justified under the *Turner* standard. Pfister is thus entitled to summary judgment as to HRDC's First Amendment claim. Although the undisputed facts also show that HRDC did not receive notice of this censorship, HRDC provided no evidence of Pfister's personal involvement with or even knowledge about the notice process. Pfister is thus entitled to summary judgment as to HRDC's Fourteenth Amendment claim.

- Defendant Rains served as warden at Robinson from 2016 through 2018 during which time PLN Vo. 28, No. 8 was censored. However, for the reasons discussed above, this censorship was justified under the *Turner* standard. Rains is thus entitled to summary judgment as to HRDC's First Amendment claim. Although the undisputed facts also show that HRDC did not receive notice of this censorship, HRDC provided no evidence of Rains's personal

involvement with or even knowledge of the notice process. Rains is thus entitled to summary judgment as to HRDC's Fourteenth Amendment claim.

- Defendant Watson[18] served as warden at Western Illinois from 2017 through 2020, during which time PLN Vol. 29, No. 8 and CLN Vol. 1, No 10 were censored. For the reasons discussed above, censorship of PLN Vol. 29, No. 8 at Western Illinois was justified under the *Turner* standard. Defendants concede that censorship of CLN Vol. 1, No 10 was not justified but argue it was a reasonable mistake. The Court agrees; the evidence reflects only one single instance where Watson was responsible for an incorrect censorship decision. As a result, although HRDC is entitled to summary judgment as to declaratory and injunctive relief related to the censorship of CLN Vol. 1, No 10, HRDC is not entitled to monetary relief beyond nominal damages against Watson.

- Defendant Anderson served as warden at Western Illinois from 2010 – 2017. The undisputed facts show that of the relevant issues, Anderson was only personally involved in the review of PLN Vol. 27, No. 7. Defendants concede that censorship of PLN Vol. 27, No. 7 was not justified but argue it was a reasonable mistake. The Court agrees; the evidence reflects only one single instance where Anderson was responsible for an incorrect censorship decision. The evidence does not support a finding that Anderson acted with

---

[18] HRDC does not appear to not seek summary judgment against Watson for due process violations despite putting forth in their statement of facts that Western Illinois never sent notice after censoring CLN Vol. 1, No. 10. *See* [299] at 26.

a mental state beyond gross negligence. As a result, although HRDC is entitled to summary judgment as to declaratory and injunctive relief related to the censorship of PLN Vol. 27, No. 7, HRDC is not entitled to monetary relief beyond nominal damages. Further, it is undisputed that HRDC did not receive notice of this censorship decision. However, the evidence does not establish that Anderson acted (or failed to act) with a mental state beyond gross negligence. Thus, HRDC is entitled only to declarative relief and nominal damages in their Fourteenth Amendment claim against Anderson.

- Defendant Sullivan served as warden at Big Muddy from 2017 through 2020. During that time, several issues were censored. As discussed above, there is a dispute of fact regarding the reason for that censorship that precludes awarding either party summary judgment on HRDC's First Amendment claim. Although HRDC received no notice of censorship for several of those issues, HRDC presented no evidence of Sullivan's personal involvement with or knowledge about the notice process. Sullivan is thus entitled to summary judgment as to HRDC's Fourteenth Amendment claim.

- Defendant Jeffreys was director or acting director of IDOC from June 2019 through April 2023. Jeffreys testified that he has ultimate responsibilities for ensuring compliance with policies and ensuring that policies complied with the law. During Jeffreys's tenure, the admissible evidence—both disputed and undisputed—demonstrates that only one article of PLN, PLN

Vol. 30, No. 11, was censored. For the reasons discussed above, this censorship was justified under the *Turner* standard. Jeffreys is thus entitled to summary judgment as to HRDC's First Amendment claim. As to the Fourteenth Amendment claim, there is a dispute of fact as to whether HRDC received notice regarding the censorship of the single issue. Summary judgment is thus not appropriate on this claim for either party.

- Defendant Baldwin was director of IDOC from August 2015 through May 2019. HRDC seeks hold Baldwin liable under a theory that he acted or failed to act with a deliberate or reckless disregard for HRDC's constitutional rights. Baldwin testified that he had ultimate responsibility to correct department practices that did not comply with IDOC policies and that he was responsible for ensuring that IDOC policies complied with the law. HRDD takes issue with the fact that during Baldwin's tenure, six different IDOC facilities were found noncompliant in audits of their publication review process, but Baldwin testified that he could not recall ever being made aware of any such audits. When Baldwin was asked if would have taken steps, as IDOC director, to rectify problems with publication review audits had he been aware of them, Baldwin testified he did not know the answer to the question. Yet HRDC presents no evidence that whatever findings were contained in those audits have any relation to the deprivation of HRDC's rights in this case. And even if they had, such evidence would not establish that Baldwin acted or failed to act with a mental state beyond

gross negligence. For Baldwin to be liable for monetary damages, HRDC would have to establish that "[knew] about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he] might have seen." *Jones*, 856 F.2d at 992. There is no evidence in the record upon which the Court could find Baldwin acted with the requisite mental state to be held liable for any monetary damages. However, for the reasons stated throughout this opinion, HRDC is entitled to declarative and injunctive relief for the instances of improper censorship and unsent notice that occurred during his tenure, and nominal damages for the same.

## CONCLUSION

For the stated reasons, HRDC's motion for summary judgment [290] and Defendants' motion for summary judgment [305] are granted in part and denied in part. HRDC is entitled to declaratory relief as to their facial attacks on the STG Provision and Catch All Provision of the 2022 AD. HRDC is further entitled to declaratory relief as to their facial attack on the notice and appeal provisions of the 2006 and 2019 AD. HRDC is entitled to declaratory and injunctive relief as to the censorship of PLN Vol. 27, No. 3 (March 2016), PLN Vol. 27, No. 7 (July 2016), and CLN Vol. 1 No. 10 (September 2018) and the absence of notice and appeal opportunities as to PLN Vol. 27, No. 7 PLN Vol. 28, No. 2, PLN Vol. 28, No. 3, PLN Vol. 28, No. 4, PLN Vol. 28, No. 8, PLN Vol. 28, No. 10, PLN Vol. 29, No. 1, PLN Vol. 29, No. 2, PLN Vol. 29, No. 3, PLN Vol. 29, No. 5, PLN Vol. 29, No. 6, PLN Vol. 29, No. 7. Finally, HRDC is entitled to nominal damages against Defendants Hansbro

(First Amendment claim), Carter (First Amendment claim), Scott (Fourteenth Amendment claim), Watson (Fourteenth Amendment claim), Anderson (First and Fourteenth Amendment claims), and Baldwin (First and Fourteenth Amendment claims).

The following Defendants are entitled to summary judgment: Dennison (First and Fourteenth Amendment claims), Dorethy (First and Fourteenth Amendment claims), Gomez (First and Fourteenth Amendment claims), Jaimet (First and Fourteenth Amendment claims), Swalls (First and Fourteenth Amendment claims), Butler (First and Fourteenth Amendment claims), Rose (First and Fourteenth Amendment claims), Hansbro (Fourteenth Amendment claim), Carter (Fourteenth Amendment claim), Lashbrook (First Amendment and Fourteenth Amendment claim), Bradley (First Amendment claim), Rose (First and Fourteenth Amendment claim), Scott (First Amendment claim), Shemonic (First and Fourteenth Amendment claim), Melvin (First and Fourteenth Amendment claim), Pfister (First and Fourteenth Amendment claim), Rains (First and Fourteenth Amendment claim), Watson (First Amendment claim), Sullivan (Fourteenth Amendment claim), Jeffreys (First Amendment claim). The following Defendants are thus dismissed with prejudice from the litigation: Dennison, Dorethy, Gomez, Jaimet, Swalls, Butler, Lashbrook, Bradley, Rose, Shemonic, Melvin, Pfister, and Rains.

Finally, the Court denies summary judgment to both parties on HRDC's due process facial challenge to the 2022 AD ,the First Amendment as applied as-applied challenges related to PLN Vol. 28, No. 2 (February 2017), PLN Vol. 28, No. 3 (March

2017), PLN Vol. 28, No. 4 (April 2017), PLN Vol. 29, No. 2 (February 2018), PLN Vol.

29, No. 3 (March 2018), PLN Vol. 29, No. 5 (May 2018), PLN Vol. 29, No. 6 (June

2018), PLN Vol. 29, No. 7 (July 2018), PLN Vol. 29, No. 8 (August 2018), and the

Fourteenth Amendment as-applied challenge to PLN Vol. 30, No. 11. The parties are

to confer and file a status report regarding the remaining claims by May 5, 2025.


E N T E R:

Dated: March 31, 2025

_____
MARY M. ROWLAND
United States District Judge

47